# EXHIBIT 1

# POLICY ATTACHED



## Your lifeline ...

**at the first sign of a food borne crisis = Specialty Risk Management, Inc. (SRM.)**

SRM focuses on minimizing the effects of a business interruption to your bottom line.

Our 24-hour crisis management team can help:

- Help avoid/control the media
- With government regulators
- With your employees
- With your customers

Our 200,000$^+$ client interactions help us offer experienced-based solutions.

Let us help in the earliest stages before an issue becomes a business interruption.



**800-328-7761**
**512-328-2545**
**8:30 a.m. - 5:30 p.m. CST**
**www.callsrm.com**
**riskmanagers@callsrm.com**

- Staffed with Nationally Certified Professionals
- Hotline Services since 1992
- SRM, Inc. is not the insurance carrier.

## *UNDER PENALTY OF "MATTRESS TAG POLICE"*

**This flyer is not to be removed except by the insured.**

**Using the services of SRM does not guarantee insurance coverage for the attached policy.**

This policy is issued by an insurer not authorized to do business in Kansas and, as such, the form, financial condition, and rates are not subject to review by the Commissioner of insurance and the insured is not protected by any guaranty fund.

# TRADE NAME RESTORATION LOSS OF BUSINESS INCOME AND INCIDENT RESPONSE INSURANCE FOR FOOD BORNE ILLNESS

This Insurance is effected with Certain Underwriters at Lloyd's, London (not incorporated).

This Policy Certificate is issued in accordance with the limited authorization granted to the Coverholder by Certain Underwriters at Lloyd's, London whose names and the proportions underwritten by them can be ascertained from the office of said Coverholder (such Underwriters being hereinafter called "Underwriters") and in consideration of the premium specified herein. Underwriters do hereby bind themselves each for his own part, and not one for another, their heirs, executors and administrators.

The Insured is requested to read this certificate, and if not correct, return it immediately to the Coverholder for appropriate alteration.

All inquiries including complaints regarding this policy should be addressed to the following Coverholder:

*Professional Liability Insurance Services, Inc. ®*
*5802 Thunderbird, Building 10, Suite 100, Lago Vista, Texas 78645*
*Phone: 512-328-0677; Fax: 512-327-5834 Email: underwriting@plisinc.com*

The Coverholder acts as agent for the Underwriters in performing it's duties under this agreement.

UMR# B113518B01324
Reference #18B01324

(Professional Liability Insurance Services, Inc. dba Professional Liability Insurance Services, Inc. - Underwriting Facilities; Professional Liability Insurance Services - Underwriting Facilities; Texas Professional Liability Insurance Services, Inc. - Underwriting Facilities; Professional Liability Insurance Services, Incorporated - Underwriting Facilities; in the state of New York and California, CA License #0G17062 as Texas Professional Liability Insurance Services)



# DECLARATIONS
TRADE NAME RESTORATION®, LOSS OF BUSINESS INCOME AND
INCIDENT RESPONSE INSURANCE FOR FOOD BORNE ILLNESS

**A.**   **Insured, Trade Name(s), Policy Certificate No. and Period of Insurance:**

**Policy Certificate No.:**   TNR 18 8157

**Insured Name and Address:**   Joe's Kansas City Bar-B-Que, Inc.
3002 W. 47th Ave., Kansas City, KS 66103

**Trade Name(s):**   Joe's Kansas City Bar-B-Que

**Period of Insurance**:   from   06/01/19   at 12:01 A.M. to   06/01/20   at 12:01 A.M. (Local Standard Time)

**B.**   **Limits of Indemnity and Deductible:**

Limit of Indemnity for **Restaurant Events** (Section 2.1):   $4,000,000   per **Period of Insurance**

Limit of Indemnity for **Supplier Events** (Section 2.2):   $4,000,000   per **Period of Insurance**

Limit of Indemnity for **Workplace Violence Events (By Endorsement Only)**:   $500,000   per **Covered Location**
$1,000,000   per **Period of Insurance**

Limit of Indemnity for **Incident Response Expenses** (Section 2.3):

as respects **Restaurant Events**: 50 % of the Limit of Indemnity for **Restaurant Events**
as respects **Supplier Events**: 50 % of the Limit of Indemnity for **Supplier Events**
as respects **Workplace Violence Events**: 50 % of the Limit of Indemnity for **Workplace Violence Events**

Limit of Indemnity for **Extortion Payments** (Section 2.4):   $1,000,000   per **Period of Insurance**

Total Policy Aggregate Limit of Indemnity (Section 2.5):   $4,000,000   per **Period of Insurance**

Shared Aggregate Limit of Indemnity (Section 2.6):   N/A   per **Period of Insurance**

**Deductible (Section 4.7):**
as respect **Restaurant Events** and **Supplier Events**:   $10,000   Each and Every **Incident**
as respect **Workplace Violence Events(By Endorsement Only)**:   $5,000   Each and Every **Covered Location**

**C.**   **Period of Restoration (Section 4.24):**

The longest **Period of Restoration** that may be afforded by this Policy is eighteen (18) months

**D.**   **Premium:**

| | |
|---|---|
| Annual: | $5,463.00 |
| Policy Fee: | $ 150.00 |
| | |
| | |
| | |
| State Surplus Lines Tax: | |
| State Stamping Office Fee: | |
| | |
| Total: | $5,613.00 |

**Covered Locations:** 3

There will be a $1,129.00   charge per each additional **Covered Location** including Workplace Violence Coverage.

Copyright © PLIS®, Inc.

# DECLARATIONS Continued

**Policy Certificate No.:**   TNR 18 8157

**Insured(s) Name and Address:**   Joe's Kansas City Bar-B-Que, Inc.

3002 W. 47th Ave., Kansas City, KS 66103

**Period of Insurance:**   from  06/01/19   at 12:01 A.M. to  06/01/20   at 12:01 A.M. (Local Standard Time)

---

**E.**   **Service of Suit, Claims Notification and Crisis Management:**

**Service of Suit:**   Mendes and Mount, 750 Seventh Avenue, New York, New York  10019-6829

---

**CLAIMS NOTIFICATION:**   Professional Liability Insurance Services, Inc. ®
5802 Thunderbird, Building 10, Suite 100, Lago Vista, TX 78645
P: 1-800-761-7547; F: 512-267-6246; Email: claims@plisinc.com
(d/b/a Professional Liability Insurance Services, Inc. – Underwriting Facilities; Professional Liability Insurance Services - Underwriting Facilities; Texas Professional Liability Insurance Services, Inc. - Underwriting Facilities; Professional Liability Insurance Services, Incorporated - Underwriting Facilities; in the state of New York and California, CA License #0G17062 as Texas Professional Liability Insurance Services)

**CRISIS MANAGEMENT:**   Specialty Risk Management, Inc.® ; PHONE: (800) 328-7761; FAX: (512) 328-2486
**IF YOU BELIEVE THAT AN INCIDENT HAS OCCURRED, PLEASE CONTACT THE 24-HOUR CRISIS HOTLINE**

---

**Forms Included with this Policy:**

Covered Locations Endorsement; Workplace Violence Endorsement; Inoculations, Vaccinations and Testing Endorsement; Product Recall Endorsement; Pandemic Event Endorsement; LSW 1001 Several Liability Notice; LMA 5020 Service of Suit Clause (USA); LMA 5021 Applicable Law (USA); CL 380 Institute Cyber Attack Exclusion Clause; NMA 1256 Nuclear Incident Exclusion Clause Liability Direct (Broad); NMA 45 New Short Rate Cancellation Table Endorsement (USA); LMA 5219 as amended U.S. Terrorism Risk Insurance Act of 2002 As Amended Not Purchased Clause; LMA 3100 Sanction Limitation and Exclusion Clause; TNR Policy Form 02-17.

The Declarations and the forms and any Endorsement(s) listed above and attached hereto, together with the completed and signed Application and supplements, shall constitute the contract between the **Insured(s)** and the Underwriters.

U.S. CLASSIFICATION:   Surplus Lines

Professional Liability Insurance Services, Inc.; 5802 Thunderbird, Building 10, Suite 100, Lago Vista, TX  78645

EFFECTED WITH:   100.00% with Certain Underwriters at Lloyd's:
Individual syndicates are as follows:

| | | | |
|---|---|---|---|
| 15.46464% | Syndicate 2623 | 5.99480% | Syndicate 1183 |
| 3.39468% | Syndicate 0623 | 3.83268% | Syndicate 0510 |
| 11.98961% | Syndicate 2987 | 3.33045% | Syndicate 0435 |
| 3.33045% | Syndicate 2988 | 2.66436% | Syndicate 2791 |
| 7.49351% | Syndicate 1967 | 1.99827% | Syndicate 1729 |
| 6.66089% | Syndicate 2001 | 1.59861% | Syndicate 2488 |
| 5.32872% | Syndicate 0510 | 4.79085% | Syndicate 4141 |
| 3.19390% | Syndicate 1084 | 12.67400% | Syndicate 2007 |
| 1.59695% | Syndicate 1084 | 2.66436% | Syndicate 0609 |
| 1.99827% | Syndicate 0727 | | |

Countersigned:   *David J Hanley*

Authorized Representative

Copyright © PLIS®, Inc.

Syndicate listing as related to Pandemic Event coverage is as follows:

EFFECTED WITH:   100.00%  with Certain Underwriters at Lloyd's:
Individual syndicates are as follows:

| | | | |
|---|---|---|---|
| 8.44117% | Syndicate 2623 | 7.35294% | Syndicate 4141 |
| 1.85294% | Syndicate 0623 | 1.47059% | Syndicate 0727 |
| 4.41176% | Syndicate 2987 | 7.35294% | Syndicate 1183 |
| 2.94118% | Syndicate 2988 | 3.67647% | Syndicate 0435 |
| 7.35294% | Syndicate 1084 | 2.94118% | Syndicate 2791 |
| 7.35294% | Syndicate 1967 | 3.67647% | Syndicate 1729 |
| 7.35294% | Syndicate 0510 | 1.83824% | Syndicate 2488 |
| 5.51471% | Syndicate 2001 | 7.35294% | Syndicate 0609 |
| 7.35294% | Syndicate 0510 | 11.76471% | Syndicate 2007 |

Copyright © PLIS®, Inc.

**PLIS**

# TRADE NAME RESTORATION® INSURANCE APPLICATION
Loss of Business Income & Incident Response for Food Borne Illness

PROFESSIONAL LIABILITY INSURANCE SERVICES®, INC.
UNDERWRITING FACILITY - SINCE 1983

**P:** 800.761.7547  |  **F:** 512.327.5834  |  **E:** UNDERWRITING@PLISINC.COM  |  **W:** WWW.PLISINC.COM

1. **Applicant Company Name:** Joe's Kansas City Bar-B-Que, Inc.
   **Restaurant Trade Name(s):** Joe's Kansas City Bar-B-Que of Leawood, Joe's Kansas City Bar-B-Que of Olathe, Joe's Kansas City Bar-B-Que
2. Mailing Address: 3002 W 47th Ave
3. City, State, Zip Code: Kansas City KS 66103
4. **Risk/Crisis Management Contact Person:** Jacque Hathaway
   Phone: 913-791-0047                E-mail: jacque.h@joeskc.com
5. Type of Operation: ☐ Fast Food  ■ Fast Causal  ☐ Casual Dining  ☐ Fine Dining  ☐ Buffet  ☐ Other _____
6. **Total Annual Sales All Locations:** 27,319,019          Number of years in business: 47th 22 Years / Olathe 14 Years / Leawood 7 Years
7. 

| Average store | | | | Largest store | | |
|---|---|---|---|---|---|---|
| a. Annual Sales | $ 9,000,000 | | | a. Annual Sales | $ 9,033,780 | |
| b. Net Income | $ 800,000 | 9 % | | b. Net Income | $ 1,003,718 | 11 % |
| c. Fixed Expense | $ 300,000 | 4 % (Rent, Debt, Utility, etc.) | | c. Fixed Expense | $ 300,000 | 0 % |
| d. Payroll | $ 2,900,000 | 32 % (Necessary continuing) | | d. Payroll | $ 2,820,465 | 31 % |

8. Total employee count (all locations):    Full Time  160          Part Time  82
9. 

| Top 5 Food Suppliers (non-distributors) | Product Supplied: | |
|---|---|---|
| a. PEPSI | a. SODA | |
| b. LIBERTY FRUIT | b. FRUITS AND VEGETABLES | |
| c. ROMA | c. BREAD | |
| d. VAUGHN WOOD | d. WOOD FOR SMOKERS | |
| e. HEARTLAND COCA COLA | e. BOTTLED DRINKS | |

Distributor(s) Utilized:  ■ Sygma/Sysco  ☐ US Food Service  ☐ McLane  ■ Ben E Keith  ☐ Other _____

10. Please complete the following for all stores (or, submit in an accompanying Excel Format spreadsheet):

| State | Number of Owned Stores | Number of Franchised Stores |
|---|---|---|
| KANSAS | 3 | 0 |
| | | |
| | | |
| | | |

Do you have any locations outside of the United States?)   YES ☐  NO ☐   If yes, please complete the following:

| # of Locations | Country | Trade Name |
|---|---|---|
| | | |
| | | |

11. a. Average number of meals served per week/per location:  8,665
    b. Average dollar ($$) value of guest check:  $26.80 / Guest

12. Metropolitan area (city) with the largest Number of Locations:  N/A

13. a. Planned number of new locations in next 12 months (include expected open date and city/state of new location):
       0
    b. Planned number of locations to be closed in next 12 months (include expected close date and city/state of location):
       0

14. Do you have a written procedure for the following?
    a. Food Handling ..................... YES ■  NO ☐
    b. Cooking Methods ................. YES ■  NO ☐
    c. Sanitation ........................... YES ■  NO ☐
    Does the Franchise Agreement (if any) require compliance with the above written procedures? .......................... YES ☐  NO ☐  N/A ■
    If no, which procedures are not required and why? _____

15. Are all newly hired employees trained in kitchen sanitation practices including, the following?:
    a. Equipment sanitation .............. YES ■  NO ☐       d. Food temperatures ............... YES ■  NO ☐
    b. Cross contamination .............. YES ■  NO ☐       e. Storage ............................. YES ■  NO ☐
    c. Cutting boards ....................... YES ■  NO ☐       f. Personal hygiene ................. YES ■  NO ☐

16. Are there refresher courses or ongoing training for existing employee? ................................ YES ■  NO ☐
    Explain  They are required to complete Serv Safe Testing

17. Do you check to ensure that employees continue to use good food handling procedures and hygiene? ............... YES ■  NO ☐
    How?  Test them with the Serv Safe Book

18. a. Do you have any catering operations? ................................................................................... YES ■  NO ☐

Copyright © PLIS®, Inc.                    - 1 -                    Rev. 03-18

b. Percentage of total revenues derived from catering: 5.2 _____ %
c. Number of locations that provide catering services: 3 _____

19. Do any location(s) provide "pick up"/"take out" orders? .................................................................................................................................... YES ■ NO ☐
Which locations? 47th Street, Olathe and Leawood _____
Are containers labeled with Food Handling instructions (e.g. storing, reheating, etc.)? *If yes, please provide a sample of the Food Handling instructions* ...... YES ■ NO ☒

20. Do you currently have a HACCP plan and/or ServSafe procedures in place? ...................................................................................................... YES ■ NO ☐

21. Do you (or a third party) test food received from suppliers for contamination? ................................................................................................ YES ■ NO ☐
*If yes, please describe.* We taste and temp everything that comes in the door _____
a. If tests are performed by a third party, who is it? _____
b. Who verifies that suppliers are meeting their standards, for testing, storing, or transportation of products? _____

22. Is there a written crisis management plan in effect to counteract media coverage for a food borne illness? .............................................. YES ■ NO ☐
Who is the designated media spokesperson & what is his/her everyday job title? _____

23. During the last five years, has any location experienced or been involved in the following?:
   a. An accidental or malicious contamination incident resulting in a business interruption .................................................................. YES ☐ NO ■
   b. An extortion attempt ....................................................................................................................................................................... YES ☐ NO ■
   c. Cited or closed down by any public health authority or civil authority ........................................................................................... YES ☐ NO ■
   d. A food borne illness incident resulting in a business interruption ................................................................................................. YES ☐ NO ■
   e. A workplace violent event ............................................................................................................................................................... YES ☐ NO ■
   f. A data breach event ........................................................................................................................................................................ YES ☐ NO ■
   g. A supplier recall event .................................................................................................................................................................... YES ☐ NO ■
   h. A pandemic event ........................................................................................................................................................................... YES ☐ NO ■
   *If Yes to any of the above, provide complete the Claims Supplement with dates, details, and amount of the loss, if applicable.* ...... YES ☐ NO ■

24. Provide information about similar or comparable Insurance carried during the past year. *If no current coverage is in force, check the box:* ☐
Carrier: Lloyds _____   Coverage: $ 4,000,000 _____ /$ 4,000,000 _____   Ded/SIR: $ 10,000 _____
Premium: $ _____   Policy Period: 6/1/18 _____ to 6/1/19 _____   Number of Insured Locations: 3 _____

**ATTACHMENTS REQUIRED WITH THE APPLICATION:** *(Additional information may be required for final underwriting approval based on Underwriting requirements)*

_____ List of Locations, Separated by Corporate Owned and Franchised Owned (if applicable), By Trade Name in an **Excel Format** spreadsheet.

**NOTICE**

The Applicant represents to the best of its knowledge and belief that the statements set forth are true and include all material information, and that there has been no attempt at suppression or misstatement of any material facts known, or which should be known, which might affect the judgment of Underwriters in their rating and/or acceptance of this risk.

The Applicant agrees that if a contract of insurance is provided by Underwriters, this Application and any other previous Applications, along with any additional supplemental applications, any attachments and supplied information shall be the basis for the formation of such contract and shall be a material and integral part of the Policy, whether or not they are attached to the Policy and/or signed by the Applicant.

Any representations made in the application process for any Policy that may be issued by Underwriters, and the statements made within this Application, any additional supplemental applications, any attachments and supplied information shall be construed as representations of the Applicant.

The Applicant represents that the person signing and initializing this Application and any additional supplemental applications has been authorized to do so by the Applicant.

Signing of this Application and any additional supplemental applications does not bind the Insurer to an offer nor the Applicant to accept insurance.

The Applicant further agrees that if the information supplied on this Application, any additional supplemental applications, any attachments and supplied information changes between the date of this Application and the inception date of the Policy, the Applicant will immediately notify Underwriters of such change prior to inception of the Policy. JS (Initials)

Applicant further understands and agrees that no person or entity other than Underwriters has the right to waive or change any part of the Policy. Furthermore, notice to any agent or knowledge possessed by any agent or other persons acting on behalf of the Applicant shall not effect a waiver or a change in any part of the Policy nor estop Underwriters from asserting any right under the terms of the Policy.

By signing this Application and any additional supplemental applications, the Applicant confirms that they have been provided with and inspected a specimen of the Trade Name Restoration Insurance wording and any applicable endorsements. Underwriters expect that the Applicant will take time to review the Policy to ensure that they fully understand the coverages provided. The Applicant should feel free to consult with any source, including legal advisors, regarding coverage.

**CRISIS MANAGEMENT/RISK MANAGEMENT:** The proposed policy is designed for risks that agree to use the crisis management/risk management services as approved and appointed by Underwriters as defined in the Policy Declarations. The Applicant Company agrees to immediately contact the designated 24-hour crisis management services as defined in the Declarations in the event of any actual or potential food borne illness event.

**CANADIAN NOTICE**
➢ All indications are stated in U.S. dollars.
➢ Premium indicated and bound will be the amount to be paid in US Dollars no later than 30 days from the effective date insurance.
➢ Any claims payments will be in U.S. dollars.
➢ By signing this application, the undersigned confirms that the present document, and any other document(s) or correspondence pertaining to the present insurance or application for insurance is accepted in the English language.

**In addition to all other terms and conditions: Applicable in Kentucky.** Any person who knowingly and with intent to defraud any insurance company or other person files an Application for insurance containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

_____   3/26/2019   Joy Stehney
Applicant's authorized Signature of a Principal, Partner or Officer   Date   Printed Name of Applicant's authorized signature of a Principal, Partner or Officer

Copyright © PLIS®, Inc.   - 2 -   Rev. 03-18

# POLICYHOLDER DISCLOSURE
# NOTICE OF TERRORISM
# INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Act of 2002, as amended ("TRIA"), that you now have a right to purchase insurance coverage for losses arising out of acts of terrorism, **As defined in section 102(1) of the Act, as amended:**  The term "acts of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.  Any coverage you purchase for "acts of terrorism" shall expire at 12:00 midnight December 31, 2020, the date on which the TRIA Program is scheduled to terminate, or the expiry date of the policy whichever occurs first, and shall not cover any losses or events which arise after the earlier of these dates.

YOU SHOULD KNOW THAT COVERAGE PROVIDED BY THIS POLICY FOR LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM IS PARTIALLY REIMBURSED BY THE UNITED STATES UNDER A FORMULA ESTABLISHED BY FEDERAL LAW, HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS.  UNDER THIS  FORMULA, THE UNITED STATES PAYS 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON
JANUARY 1, 2019 AND 80% BEGINNING ON JANUARY 1, 2020; OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURER(S) PROVIDING THE COVERAGE.  YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A USD100 BILLION CAP THAT LIMIT U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS USD100 BILLION.  IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED USD100 BILLION, YOUR COVERAGE MAY BE REDUCED.

THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

_____ I hereby elect to purchase coverage for acts of terrorism for a prospective premium of USD $_____

___X___ I hereby elect to have coverage for acts of terrorism excluded from my policy.  I understand that I will have no coverage for losses arising from acts of terrorism.

_____          5/22/19          <u>Certain Underwriters at Lloyd's</u>
Policyholder/Applicant's Signature          Date

_____          6/1/19
Print Name                                  Requested Effective Date of Coverage

LMA 9104

**Professional Liability Insurance Services, Inc. dba Professional Liability Insurance Services, Inc. - Underwriting Facilities; Professional Liability Insurance Services - Underwriting Facilities; Texas Professional Liability Insurance Services, Inc. - Underwriting Facilities; Professional Liability Insurance Services, Incorporated - Underwriting Facilities; in the state of New York and California, CA License #0G17062 as Texas Professional Liability Insurance Services**

## <u>COVERED LOCATIONS ENDORSEMENT</u>

**POLICY CERTIFICATE NO.:**   <u>TNR 18 8157</u>

*This Endorsement changes the Policy – please read it carefully.*

In consideration of the premium charged, listed below are the **Covered Locations** under this Policy:

1. 2850 W. 47th St. Kansas City, KS  66103
2. 11723 Roe Ave, Leawood KS  66211
3. 11950 S. Strang Line Rd. Olathe, KS 66062

*All other terms, conditions and exclusions of this Policy remain unchanged.*

Countersigned:   *David J Hanley*
                          ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                          Authorized Representative

UMR Number: B113518B01324

## <u>WORKPLACE VIOLENCE ENDORSEMENT</u>

**POLICY CERTIFICATE NO.:**  <u>TNR 18 8157</u>

*This Endorsement changes the Policy – please read it carefully.*

In consideration of the premium charged, it is hereby understood and agreed that the Policy is amended as follows:

Section 2. <u>LIMITS OF INDEMNITY</u> is amended to delete and replace the following:

**2.3** **"Limit of Indemnity for Incident Response Expenses"** - Underwriters' maximum liability for **Incident Response Expenses** affecting all **Covered Locations** insured hereunder for **Restaurant Events**, **Supplier Events**, and **Workplace Violence Events** shall not exceed the corresponding "Limit of Indemnity for **Incident Response Expenses**" set forth in Section B of the Declarations, regardless of the number of **Insureds** named in the Declarations. **Incident Response Expenses** shall be in excess of any applicable **Deductible**, except that **Crisis Management Expenses** paid as part of **Incident Response Expenses** shall not be subject to the **Deductible**. Any amounts paid hereunder with respect to **Incident Response Expenses** shall reduce the remaining applicable Limits of Indemnity payable with respect to **Actual Net Loss**.

Section 2. LIMITS OF INDEMNITY is also amended to add the following:

**2.7 (WPV)** "Limit of Indemnity for **Workplace Violence Events**" - Underwriters' maximum liability for **Actual Net Loss** and **Incident Response Expenses** affecting **Covered Locations** insured hereunder for **Workplace Violence Events** shall not exceed the "Limit of Indemnity for **Workplace Violence Events**" set forth in Section B of the Declarations and shall be in excess of any "**Deductible** for **Workplace Violence Events**."

Section 4. DEFINITIONS is amended to delete and replace the following:

**4.3 (WPV)** "**Affected Covered Location**" means a **Covered Location** whose **Normal Gross Revenues** are reduced due directly and solely to the occurrence of an **Incident**. However, for **Workplace Violence Events**, **Affected Covered Location** shall mean only the specific **Covered Location** where the **Workplace Violence Event** occurred and whose **Normal Gross Revenues** are reduced due directly and solely to the occurrence of a **Workplace Violence Event**.

**4.13 (WPV)** "**Incident**" means either:

    **(a)** a **Workplace Violence Event**, or

    **(b)** a **Restaurant Event**, **Supplier Event**, or **Extortion Threat**.  All **Restaurant Events**, **Supplier Events**, or **Extortion Threats** arising out of the same common cause shall be considered one **Incident**, regardless of the number of involved persons, **Public Announcements** or **Covered Locations**, and the **Incident** shall be deemed to have occurred at the time of the earliest occurrence of the **Restaurant Event**, **Supplier Event**, **Public Announcement** thereof, or **Extortion Threat**. In the event either a **Restaurant Event** or **Extortion Threat** or both is considered one **Incident** with a **Supplier Event** under this provision, the combined **Incident** shall be considered solely as a **Supplier Event**.

**4.24 (WPV)** "**Period of Restoration**" means either:

    **(a)** for **Workplace Violence Events,** a period of three (3) months from the date of the **Workplace Violence Event,** or

    **(b)** for **Restaurant Events**, **Supplier Events**, or **Extortion Threats,** the period that commences on the date of the **Incident** and ends on the earlier of the following dates:

(i) the first date that the **Gross Revenues** derived from the **Insured's** normal and customary business operations at each **Affected Covered Location** return to the **Normal Gross Revenues** for such **Affected Covered Location** and thereafter remain at or above the **Normal Gross Revenues** for such **Affected Covered Location** for the next six (6) consecutive days; or

(ii) the last date of the period of time set forth in Section C of the Declarations from the date of the **Incident**;

The **Period of Restoration** shall not be affected by the expiration of the **Period of Insurance**.

Section 4, <u>DEFINITONS</u> is also amended to add the following:

**4.14 (WPV)** "**Incident Response Expenses**"

(g) the cost of grief counseling services for employees of the **Insured**;

(h) the cost of cleanup and cleanup services at the **Affected Covered Location**(s);

(i) the cost of funeral and burial expenses; and

(j) increased cost of security, provided that the designated **Crisis Management** consultant as stated in the **Declarations** has specifically recommended such additional security measures.

**4.34 (WPV)** "**Workplace Violence Event**" means any intentional and unlawful act of deadly force or threat thereof at a **Covered Location** that has or could have resulted in bodily injury or death and is directed specifically against the employees, customers, vendors or facility of the **Covered Location**.

Section 6, <u>EXCLUSIONS</u> is also amended to add the following:

This insurance also does not cover any of the following:

**6.21 (WPV)** any **Actual Net Loss** that is directly or indirectly caused by, arises out of, contributed to by, in consequence of, or results from a **Workplace Violence Event** and is sustained by the **Insured** at any **Covered Location** other than the specific **Covered Location** where the **Workplace Violence Event** occurred.

*All other terms, conditions and exclusions of this Policy remain unchanged.*

Countersigned:    *David J Hanley*
                        Authorized Representative

# INOCULATIONS, VACCINATIONS AND TESTING ENDORSEMENT

**POLICY CERTIFICATE NO.:**   TNR 18  8157

*This Endorsement changes the Policy – please read it carefully.*

In consideration of the premium charged, it is hereby understood and agreed that the Policy is amended as follows:

The following provisions are added to Section B of the Declarations:

**B: Limits of Indemnity and Deductible:**

   Limit of Indemnity for **Inoculations, Vaccinations, and Testing (Section 2.7 (IVT))**: $  250,000        per **Period of Insurance**

Section 1. <u>INSURING AGREEMENT</u> is deleted in its entirety and replaced with the following:

## 1. (IVT)  <u>INSURING AGREEMENT</u>

In consideration of the foregoing and payment of the Premium, Underwriters agree, subject to all the terms, conditions, limitations and exclusions set forth herein, to indemnify the **Insured** for the following, provided that such result directly and solely from an **Incident** that occurs within the **Period of Insurance** and is reported to Underwriters in accordance with Section 7.1 of this Policy, which in no event shall be later than ninety (90) days following the termination of the **Period of Insurance**:

**1.1**  **Actual Net Loss** in excess of any **Deductible** sustained by the **Insured** at each **Affected Covered Location** during a **Period of Restoration**;

**1.2**  **Incident Response Expenses** in excess of any **Deductible**, except as to **Crisis Management Expenses**, incurred by the **Insured** during the **Period of Restoration** but only when working in cooperation with the designated crisis management consultant listed in Section E of the Declarations;

**1.3**  **Extortion Payments** incurred by the **Insured** during the **Period of Restoration** but only when working in cooperation with the designated crisis management consultant listed in Section E of the Declarations; and

**1.4**  **Inoculations, Vaccinations, and Testing**.

Section 2. <u>LIMITS OF INDEMNITY</u> is amended to add the following:

**2.7 (IVT)**   "**Limit of Indemnity for Inoculations, Vaccinations, and Testing** " - Payments made by Underwriters for **Inoculations, Vaccinations, and Testing** shall be in addition to the **Total Policy Aggregate Limit of Indemnity** set forth in Section B of the Declarations, and  Underwriters' maximum limit of liability for all such **Inoculations, Vaccinations, and Testing**  during the **Period of Insurance** shall not exceed the "Limit of Indemnity for **Inoculations, Vaccinations, and Testing**" set forth in Section B of the Declarations, as amended, regardless of the number of **Restaurant Events, Supplier Events,** or **Covered Locations**.  No **Deductible** shall apply to this additional **Inoculations, Vaccinations, and Testing** coverage.  Payments made by Underwriters under the **Inoculations, Vaccinations, and Testing** coverage will not be applied toward any **Deductible** that is applicable to any other coverage afforded by this Policy.

Where the **Insured** has other insurance that covers **Inoculations, Vaccinations, and Testing**, Underwriters' indemnity obligation under Section 1.4 is limited to reimbursement of **Inoculations, Vaccinations, and Testing** that (a) the **Insured** has incurred to satisfy the deductible of any other insurance including, but not limited to, any general liability insurance; or (b) the **Insured** has paid in excess of the limit available under such other policies.

Section 4. <u>DEFINITIONS</u> is amended to add the following:

**4.35 (IVT)**   "**Inoculations, Vaccinations, and Testing**" shall mean the expense of preventive inoculations, initial series vaccinations, and current infection testing incurred as a result of **Restaurant Events** or **Supplier Events**, provided such **Inoculations, Vaccinations, and Testing** are administered to:

(a)  employees of a **Covered Location** affected by such **Restaurant Event** or **Supplier Event,** provided, the Policy's appointed crisis management consultant has recommended the **Inoculations, Vaccinations, and Testing** and/or;

(b)  customers and employees of a **Covered Location** affected by such **Restaurant Event** or **Supplier Event**, provided a **Public Health Authority** has recommended or required the **Inoculations, Vaccinations, and Testing** but only for the exposure time period identified by the **Public Health Authority**.

Section 5. <u>CONDITIONS PRECEDENT TO LIABILTY</u> is amended to add the following:

**5.8 (IVT)**   In addition to the requirements set forth in Section 5.1 through 5.7 above, the following are conditions precedent to Underwriters' liability under Section 1.4:

    (a)   The **Insured** must first submit claim(s) to its primary insurance carriers as follows:

        (i)   In the event of employee **Inoculations, Vaccinations, and Testing**, the **Insured** must first tender the claim to its workers compensation insurance carrier, and then must provide evidence to Underwriters of both the claim tender and the insurance carrier's coverage determination, within thirty (30) days of the **Insured's** receipt of the coverage determination.

        (ii)   In the event of customer **Inoculations, Vaccinations, and Testing**, the **Insured** must first tender the claim to its general liability insurance carrier, and then must provide evidence to Underwriters of both the claim tender and the insurance carrier's coverage determination, within thirty (30) days of the **Insured's** receipt of the coverage determination.

    (b)   Within sixty (60) days of the **Insured's** receipt of all billing statements for **Inoculations, Vaccinations, and Testing**, the **Insured** must submit to Underwriters copies of such billing statements and evidence of the **Insured's** payment.

    (c)   In the event that the **Insured** desires to apply this additional coverage to a self-insured retention or deductible of another insurance policy held by the **Insured** that affords coverage for the claim, the **Insured** must, within thirty (30) days of the other insurer's acceptance of the claim, supply Underwriters with a complete copy of the insurance policy containing the self-insured retention or deductible at issue, along with a copy of the insurer's coverage determination.

Section 6. <u>EXCLUSIONS</u> is amended to add the following:

This insurance does not cover any of the following:

**6.22 (IVT)**   Aside from the costs of **Inoculations, Vaccinations, and Testing**, the cost of any other medical or other expense of any kind related to any employee, customer, or third party, such as, but not limited to: other medical testing, treatment, counseling, hospitalization, therapy, loss of earnings, transportation, lodging, or health insurance deductibles or benefits;

**6.23 (IVT)**   The cost of secondary, follow-up, or "booster" Hepatitis A vaccinations, for either employees or customers.

Section 8. <u>CONDITIONS</u> is amended to add the following:

**8.13 (IVT)**   In the event that any other insurance carrier of the **Insured** agrees to pay or reimburse the cost of **Inoculations, Vaccinations, and Testing** arising out of **Restaurant Event** or **Supplier Event** covered under this Policy, coverage under Section 1.4 only applies to the amount of any self-insured retention or deductible held by the **Insured** under such insurance policies and to **Inoculations, Vaccinations, and Testing** costs incurred by the **Insured** that exceed the payment and/or reimbursement obligations of any other insurance carrier.

*All other terms, conditions and exclusions of this Policy remain unchanged.*

Countersigned:  *David J Hanley*

                                           Authorized Representative

## <u>PRODUCT RECALL ENDORSEMENT</u>

POLICY CERTIFICATE NO.:  <u>TNR 17  8157</u>

*This Endorsement changes the Policy – please read it carefully.*

In consideration of the premium charged, it is hereby understood and agreed that the Policy is amended to delete and replace in their entirety the following correspondingly numbered provisions in Section 2 (LIMITS OF INDEMNITY) with the following for all **Covered Locations** under the Policy and any Endorsement attached thereto:

2.5 "**Total Policy Aggregate Limit of Indemnity**" - Underwriters' maximum liability for all **Actual Net Loss**, **Incident Response Expenses**, **Extortion Payments**, **Pre-Recall Expenses**, **Recall Expenses**, **Customer Recall Expenses**, **Product Rehabilitation**, **Loss of Gross Profits**, **Increased Cost of Working** and **Crisis Management Expenses** arising from all **Incidents** affecting all **Covered Locations** occurring during **the Period of Insurance** shall not exceed the "Total Policy Aggregate Limit of Indemnity" set forth in Section B of the Declarations, regardless of the number of **Covered Locations** insured hereunder or the number of **Insureds** named in the Declarations, and shall be in excess of any **Deductible** and not reduced by any **Deductible.**

2.6 "**Shared Aggregate Limit of Indemnity**" - Notwithstanding the provisions of Sections 2.1 through 2.5 above, if Underwriters have issued Policies to other **Trade Name Operators**, Underwriters' maximum liability for **Actual Net Loss**, **Incident Response Expenses**, **Extortion Payments**, **Pre-Recall Expenses**, **Recall Expenses**, **Customer Recall Expenses**, **Product Rehabilitation**, **Loss of Gross Profits**, **Increased Cost of Working** and **Crisis Management Expenses** affecting all business establishments sharing that same trade name (including the **Covered Locations** insured hereunder) shall be limited as set forth in greater detail in any Shared Aggregate Endorsement attached hereto.

For purposes of this endorsement only, the following are considered **Covered Locations**:

 *Please See Attached Listing*

As to only the **Covered Locations** listed above in this Endorsement, the Policy is amended as follows:

Section 1. <u>INSURING AGREEMENT</u> is deleted in its entirety and replaced with the following:

**1.** **(PR) INSURING AGREEMENT**

 In consideration of the foregoing and payment of the Premium, Underwriters agree, subject to all the terms, conditions, limitations and exclusions set forth herein, to indemnify the **Insured** for the following, provided that such result directly and solely from an **Incident** that occurs within the **Period of Insurance** and is reported to Underwriters in accordance with Section 7.1 of this Policy, which in no event shall be later than ninety (90) days following the termination of the **Period of Insurance**:

 **1.5  (PR) Pre-Recall Expenses**, **Recall Expenses**, **Customer Recall Expenses**, **Product Rehabilitation**, **Loss of Gross Profits** and **Increased Cost of Working**; and

 **1.6  (PR)  Crisis Management Expenses**

Section 2. <u>LIMITS OF INDEMNITY</u> is also amended to add the following:

**2.** **(PR) LIMITS OF INDEMNITY**

 **2.9** **(PR)** "**Limit of Indemnity for Product Recall Events**" - Underwriters' maximum liability **Pre-Recall Expenses**, **Recall Expenses**, **Customer Recall Expenses**, **Product Rehabilitation**, **Loss of**

**Gross Profits**, **Increased Cost of Working** and **Crisis Management Expenses** affecting all **Covered Locations** insured hereunder shall not exceed the "Limit of Indemnity for **Product Recall Events**" set forth below herein and shall be in excess of any **Deductible** and not reduced by any **Deductible**.

2.10    **(PR)** "**Limit of Indemnity for Product Rehabilitation**" - Underwriters' maximum liability for **Product Rehabilitation** affecting all **Covered Locations** insured hereunder for **Product Recall Events** shall not exceed the corresponding "Limit of Indemnity for **Product Rehabilitation**" set forth below, regardless of the number of **Insureds** named in the Declarations.  Any amounts payable under **Product Rehabilitation** shall be in excess of any **Deductible**.

| | | |
|---|---|---|
| Limit of Indemnity for **Product Recall Events**: | $  1,000,000 | Per **Period of Insurance** |
| Limit of Indemnity for **Product Rehabilitation**: | 50% | of the Limit of Indemnity for **Product Recall Events** |
| Deductible for **Product Recall Events**: | $  10,000 | Per **Incident** |

Section 4. <u>DEFINITIONS</u> is amended to delete in their entirety the following provisions: **4.24** "**Period of Restoration**"

Section 4. <u>DEFINITIONS</u> is also amended to delete and replace the correspondingly numbered provisions in their entirety with the following:

4.    **DEFINITIONS**

4.5    **(PR)**"**Accidental Contamination**" shall mean:

(a)  an unintentional, inadvertent error other than an error in design or specification made by the **Insured**; or
(b)  the introduction of an ingredient or component supplied by a third party that is contaminated or unfit for its intended purpose;

during manufacture, blending, mixing, compounding, packaging, labeling, including the instructions for use, storage or distribution of any **Insured Products** or storage of the **Insured Products** whilst in the care or custody of the **Insured**, which causes the **Insured** to have reasonable cause to believe that the use or consumption of such **Insured Products** has led or would lead to bodily injury, sickness, or disease of any person physically manifesting itself within 120 days of its consumption or use, or would lead to or has led to physical property damage to tangible property owned by a third person other than the **Insured Product** themselves.

4.9    **(PR)** "**Covered Location**" or "**Covered Locations**" shall mean the **Insured's** place or places of business listed on this endorsement.

4.13    **(PR)** "**Incident**" means a **Product Recall Event**.  All **Product Recall Events** arising out of the same common cause shall be considered one **Incident**, regardless of the number of involved persons, **Public Announcements**, or **Covered Locations**, and the **Incident** shall be deemed to have occurred at the time of the earliest occurrence of the **Product Recall Event** or **Public Announcement** thereof.

4.18    **(PR)** "**Insured Products**" means those products produced at a **Covered Location,** and listed in the product recall application, or new products produced at a **Covered Location** during the **Period of Insurance** where the **Insured** has notified Underwriters and Underwriters have accepted in writing, including their ingredients and components, and raw materials which are in production,  or have been manufactured, produced, processed, prepared, assembled, blended, mixed, compounded, packaged, labeled (including instructions for use), stored or distributed by the **Insured**.

4.20    **(PR)** "**Malicious Contamination**" shall mean the actual or threatened intentional, malicious and illegal alteration or adulteration of the **Insureds Products** whether in conjunction with a **Product Extortion Demand** or not so as to give the **Insured** or consumers reasonable cause to consider the **Insured Products** unfit or dangerous for their intended use.

Copyright ©  PLIS®, Inc. All rights reserved.

Section 4. <u>DEFINITIONS</u> is also amended to add the following:

**4.41**   **(PR) "Product Recall Event"** means an occurrence of **Accidental Contamination** or **Malicious Contamination**, provided the **Accidental Contamination** or **Malicious Contamination** resulted from operations at a **Covered Location**.

**4.42**   **(PR)** "**Gross Income**" shall mean the difference between:

**(a)**   income from sales of the relevant **Insured Products** that could have been reasonably projected but which has been lost solely and directly as a result of the relevant **Incident**, and

**(b)**   savings of variable costs which arise as a result of those sales not having been achieved, including without limitation cost of sales, cost of raw materials and all other saved costs.

**4.42**   **(PR)** "**Pre-Recall Expenses**" means

**(a)**   fees and expenses for the crisis management consultant listed in the Declarations in responding to an **Incident** before recall and/or withdrawal is initiated.  The deductible will not apply to the crisis management consultant listed in the Declarations in responding to an **Incident** before recall and/or withdrawal is initiated.

**(b)**   reasonable and necessary cost of chemical analysis and/or physical examination in order to ascertain whether the **Insured Products** have been contaminated and/or to ascertain the potential affect of **Malicious Product Contamination**, **Accidental Product Contamination**, or **Products Extortion**.

**4.44**   **(PR)** "**Recall Expenses"** means those reasonable, customary and necessary expenses itemized below which are incurred by the **Insured** and which are devoted exclusively to the purpose of the recall or withdrawal of **Contaminated Product(s)** arising out of an **Incident**.

**(c)**   The cost of public relations specialists, radio or television announcements and newspaper advertising, as approved by Underwriters;

**(d)**   Transportation cost in recalling and/or withdrawing **Contaminated Products**;

**(e)**   Expense for rent or hire of additional warehouse space;

**(f)**   Cost of hiring temporary replacement staff at a **Covered Location** other than regular employees of the **Insured**, as approved by Underwriters;

**(g)**   Compensation paid to regular employees of the **Insured** at a **Covered Location** for overtime;

**(h)**   Out of pocket expenses incurred by personnel under paragraphs (d) and (e) above, including transportation, other than to and from the employees normal place of work;

**(i)**   Cost incurred by the **Insured** for physical examination, reworking, disposal or destruction of **Contaminated Products**, including disposal or destruction of packaging material that cannot be reused, and cost incurred by the **Insured** in delivering reworked products to customers or their nominated agents, provided that the cost of reworking and delivery does not exceed the cost of replacing the **Contaminated Products**;

**(j)**   Cost incurred by the **Insured** of credits or allowances for reimbursing the value of **Contaminated Products**, up to the amount received by or due to the **Insured** for such **Contaminated Products**, which have been or will need to be disposed of or destroyed, or

**(k)**   Cost incurred by the **Insured** in replacing **Contaminated Products** which have been or will need to be disposed of or destroyed and delivering them to customers or their nominated agents.

Provided that where the **Insured** could reasonably have chosen to pay for either (h) or (i) above, Underwriters shall pay only the lesser amount.

**4.45**   **(PR)** "**Customer Recall Expenses**" means in the event the **Contaminated Products**  become part of or the whole of a product manufactured, distributed or handled by a direct customer of the **Insured**, coverage shall be extended also to apply to reimbursement by the **Insured** of **Recall Expenses** incurred by such customer and which the **Insured** has had to reimburse or pay.  Underwriters liability will, however, be limited to the equivalent **Recall**

Copyright ©  PLIS®, Inc. All rights reserved.

**Expenses** that the **Insured** would have incurred if it had carried out the recall or withdrawal itself.

4.46    "**Product Rehabilitation**" means sales and marketing expenses, as approved by Underwriters, including, reasonable and customary shelf space and slotting fees, up to an amount forming part of, but not exceeding the amount of 25% of the applicable Product Recall Sublimits of Indemnity set forth in this endorsement, necessarily incurred by the **Insured** in order to meet legal rehabilitation requirements and/or to reasonably re-establish the sales level and the market share of those **Insured Products** affected by an **Incident** to the level reasonably projected, taking into account the reasonable projections had no **Incident** occurred and all material changes in the market condition of any nature whatsoever, prior to the **Incident**.

4.47     "**Loss of Gross Profits**" means loss of **Gross Profit**, incurred as a result of an actual and ascertainable reduction in the Insured's sales revenue caused solely and directly by an **Incident** for the period of:

(a)    twelve (12) months, following the discovery of an **Incident** or

(b)    during which the **Insured's** sales revenue remains less than the level that would have been reasonably projected had the **Incident** not occurred.

Whichever shall be the period first to expire.

4.48    "**Gross Profit**" shall mean the difference between:

(a)    the **Insured's** revenue that would have been reasonably projected, but which has been lost solely and directly as a result of an **Incident**, and

(b)    the variable cost that would have been incurred, but which have been saved as a result of not making those sales (including the cost of raw materials, and all other saved costs).

Underwriters shall determine the amount of any **Insured** losses taking into account any savings or recoveries or offsetting or make-up of losses which have been made or which the **Insured** could reasonably have been expected to make, and the ability of the **Insured** to resume operations.

4.49    "**Increased Cost of Working**" means the reasonable and necessary costs itemized below, excess of the ordinary cost of conducting business had the **Incident** not happened, to restore only the **Insured's** properties where the **Incident** happened in order to resume operations and which is devoted exclusively to the purpose of reducing the loss.

(a)    cleaning and/or repairing of machinery and property;
(b)    additional expense to maintain work force for a period up to six (6) months after the **Incident**;
(c)    additional expense of subcontracting to a third party during the restoration of the property

4.50    "**Contaminated Products**" means those **Insured Products** which have been the subject of an **Incident**.

4.51    "**Product Extortion Demand**" means monies or the monetary value of other consideration (net of any recoveries subsequently made) paid or delivered under duress away from the **Insured's** premises following receipt of a threat that the **Insured's Product** will be subject to intentional, malicious, and illegal alteration or adulteration unless the extortion demand is met.

Section 6. EXCLUSIONS is amended to delete and replace the introductory language with the following, which is then followed by the existing sections 6.1 through 6.20: "This insurance does not cover any **Pre-Recall Expenses**, **Recall Expenses**, **Customer Recall Expenses**, **Product Rehabilitation**, **Loss of Gross Profits**, **Increased Cost of Working** or **Crisis Management Expenses** directly or indirectly caused by, arising out of, contributed to by, in consequence of, or resulting from, any of the following:"

Copyright © PLIS®, Inc. All rights reserved.

Section 6. <u>EXCLUSIONS</u> is amended to include the following:

**6.34**   Any actual or threatened, intentional, malicious and/or illegal alteration or adulteration of the product of anyone other than the **Insured**.

**6.35**   Any fraudulent or illegal or criminal act by a director or officer of the **Insured**, whether acting alone of in collusion with others.

**6.36**   **Insured Products** which at the time of manufacture, production, processing, preparation, assembly, blending, mixing, compounding, packaging, labeling, (including instruction for use) storage, distribution or sale the **Insured** knows or has reasonable ground for believing fail to comply with any national, international, governmental or local laws, regulations, codes or standards.

**6.37**   An **Incident** not advised to the Underwriters during the policy period or within ninety (90) after the expiration of the policy period.

**6.38**   Any governmental ban of or loss of public confidence in any **Insured Product** or any material or substance used in any **Insured Products.**

**6.39**   **Malicious Product Contaminations** or **Products Extortions** or **Accidental Product Contaminations** which are part of a series of connected acts or events where the first event or act in the series was first discovered, or of which the **Insured** knew or could reasonably have been expected to know, prior to the **Period of Insurance**.

**6.40**   Carcinogenic contamination

**6.41**   The design by the **Insured** of any product, including any written specification or formula.

**6.42**   The failure by a third party to adhere to procedures approved and supplied by the **Insured** regarding the care, maintenance, consumption or use of any **Insured Product**

**6.43**   Reports of an actual or alleged **Malicious Product Contamination** or **Accidental Product Contamination** of or tampering with a competitor product or a similar product not being any of the **Insured Product** not manufactured, processed or distributed by the **Insured**.

*All other terms, conditions and exclusions of this Policy remain unchanged.*

Countersigned:   _David J Hanley_

Authorized Representative

## PANDEMIC EVENT ENDORSEMENT

**POLICY CERTIFICATE NO.:**   TNR 18  8157

*This Endorsement changes the Policy – please read it carefully.*

In consideration of the premium charged, it is hereby understood and agreed that, for the purposes of this Endorsement, the Policy is amended as follows:

The following provisions are added to Section B of the Declarations:

**B: Limits of Indemnity and Deductible:**
Limit of Indemnity for **Pandemic Events** (By Endorsement Only):   $250,000   per **Covered Location**
$500,000   per **Period of Insurance**

**Deductible** (Section 4.7):
as respect **Pandemic Events** (By Endorsement Only):   $10,000   Each and Every **Incident**

Section 2. <u>LIMITS OF INDEMNITY</u> is amended to delete and replace the following:

**2.3**   **"Limit of Indemnity for Incident Response Expenses"** - Underwriters' maximum liability for **Incident Response Expenses** affecting all **Covered Locations** insured hereunder for **Restaurant Events**, **Supplier Events**, and **Pandemic Events** shall not exceed the corresponding **"Limit of Indemnity for Incident Response Expenses"** set forth in Section B of the Declarations, as amended, regardless of the number of **Insureds** named in the Declarations.

**Incident Response Expenses** shall be in excess of any applicable **Deductible; except that Crisis Management Expenses** paid as part of **Incident Response Expenses** shall not be subject to the **Deductible.**  Any amounts paid hereunder with respect to **Incident Response Expenses** shall reduce the remaining applicable Limits of Indemnity payable with respect to **Actual Net Loss.**

Section 2. <u>LIMITS OF INDEMNITY</u> is amended to include the following:

**2.11**   **"Limit of Indemnity for Pandemic Events"** - Underwriters' maximum liability for **Actual Net Loss** and **Incident Response Expenses** affecting all **Covered Location(s)** insured hereunder for **Pandemic Events** shall not exceed the Limit of Indemnity set forth in Section B of the Declarations, as amended, per **Period of Insurance** and shall be in excess of the **Deductible**.

If any indemnity is owed under Section 2.1 (**Restaurant Event),** 2.2 **(Supplier Event)** or 2.13 (**Hospitality Event**), if applicable, for any **Incident**, no indemnity shall be owed under this Section 2.11 for that same **Incident**, regardless of the number of **Pandemic Events**, involved and irrespective of whether an **Insured** sustains any loss, in whole or in part, as a result of any **Pandemic Event**.

Section 4.  <u>DEFINITIONS</u>, is amended to include**:**

**4.59**   **"Pandemic Event"** means either:

(a)  the actual presence of an **Infected Person** within a **Covered Location**; or,
(b)  the announcement by a **Public Health Authority** that a specific **Covered Location** is being closed as a result of an **Epidemic** declared by the CDC or WHO.

**4.58**   **"Infected Person"** means an individual who has been confirmed by a licensed physician to be contagious with a **Covered Disease** during an **Epidemic** of that **Covered Disease.**

**4.56**   **"Covered Disease"** is limited to the following pathogens, their mutations, or variations:

| | | |
|---|---|---|
| Avian Flu | Measles | Severe Acute Respiratory Syndrome-associated |
| Bubonic Plague | Meningococcal | Coronavirus (SARS-CoV) disease |
| Diphtheria | Monkpox | Smallpox |
| Ebola | Mumps | Swine Flu |
| Hand, Foot and Mouth Disease | Pertussis | Tuberculosis (TB) |
| Human Papillomavirus (HPV) | Polio | Varicella (Chickenpox) |
| Legionellosis | Rabies | Yellow Fever |
| Leprosy | Rotavirus | Zika Virus |
| Malaria | Rubella | or, as designated by Underwriters |

Copyright © PLIS®, Inc.
UMR#:B113518B01324

**4.57**   **"Epidemic"** means an occurrence of a **Covered Disease** that:

    (a)  rapidly and unexpectedly becomes widely distributed and affects or attacks persons simultaneously throughout a geographic location, region, territory, country, continent, or globally as defined by the World Health Organization ("WHO"), or the Center for Disease Control ("CDC"); and

    (b)  would impair normal physical function of any part, organ or system (or a combination thereof) of the body that manifests by a characteristic set of signs and symptoms;

**4.3**   **"Affected Covered Location"** For **Pandemic Event(s)**, **Affected Covered Location** shall mean only the specific **Covered Location** where the **Pandemic Event** occurred and whose **Normal Gross Revenues** are reduced by at least ten percent (10%) for a period in excess of seven (7) consecutive days, due directly and solely to the occurrence of a **Pandemic Event**.

**4.13**   **"Incident"** means a **Pandemic Event.** All **Pandemic Events** arising out of one or multiple visits by an **Infected Person** or the simultaneous presence of multiple **Infected Person(s)** within a **Covered Location,** shall be considered one **Incident**; and, the **Incident** shall be deemed to have occurred at the time of the earliest occurrence of the **Pandemic Event.**

**4.14**   **"Incident Response Expenses":**
    **(g)**  up to $10,000 for cleaning and sanitization of only the **Affected Covered Location(s)** per **Period of Insurance** for **Pandemic Event(s).**

**4.24**   **"Period of Restoration"** for **Pandemic Event** means a period of twelve (12) months.  The period commences on the date of the **Incident** and ends on the earlier of the following dates:

    **(i)**  the first date that the **Gross Revenues** derived from the **Insured's** normal and customary business operations at the **Affected Covered Location** are within ten percent (10%) of the **Normal Gross Revenues** for the **Affected Covered Location** and; thereafter, remain within ten percent (10%) of the **Normal Gross Revenues** for the **Affected Covered Location** for the next six (6) consecutive days; or

    **(ii)**  twelve (12) months from the date of the **Incident;**

The **Period of Restoration** shall not be affected by the expiration of the **Period of Insurance.**

Section 6. <u>EXCLUSIONS</u> is amended to include:

This insurance also does not cover any **Actual Net Loss**, **Incident Response Expenses**, or **Extortion Payments** directly or indirectly caused by, arising out of, contributed to by, in consequence of, or resulting from, any of the following:

**6.43**   at a **Covered Location,** other than the specific **Affected Covered Location** where the **Pandemic Event** occurred**.**

*All other terms, conditions and exclusions of this Policy remain unchanged.*

Countersigned:    *David J Hanley*

                         Authorized Representative

## <u>SEVERAL LIABILITY NOTICE</u>

**POLICY CERTIFICATE NO.:**   <u>TNR 18  8157</u>

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions.  The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.

*All other terms and conditions of this policy remain unchanged.*

LSW 1001 (Insurance)

Countersigned:   *David J Hanley*
_____
Authorized Representative

## <u>SERVICE OF SUIT CLAUSE (USA)</u>

POLICY CERTIFICATE NO.:   <u>TNR 18  8157</u>

This Service of Suit Clause will not be read to conflict with or override the obligations of the parties to arbitrate their disputes as provided for in any Arbitration provision within this Policy.  This Clause is intended as an aid to compelling arbitration or enforcing such arbitration or arbitral award, not as an alternative to such Arbitration provision for resolving disputes arising out of this contract of insurance (or reinsurance).

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction within the United States.  Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States.

It is further agreed that service of process in such suit may be made upon Mendes and Mount, 750 Seventh Avenue, New York, New York 10019-6829 and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Insured (or Reinsured) to give a written undertaking to the Insured (or Reinsured) that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured (or Reinsured) or any beneficiary hereunder arising out of this contract of insurance (or reinsurance), and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

14/09/2005
LMA5020
Form approved by Lloyd's Market Association

Countersigned:   *David J Hanley*
                  Authorized Representative

## **APPLICABLE LAW (U.S.A.)**

**POLICY CERTIFICATE NO.:**   TNR 18  8157

This Insurance shall be subject to the applicable state law to be determined by the court of competent jurisdiction as determined by the provisions of the Service of Suit Clause (U.S.A.).

14/09/2005
LMA 5021
Form approved by Lloyd's Market Association

Countersigned:   *David J. Hanley*
                        Authorized Representative

## INSTITUTE CYBER ATTACK EXCLUSION

**POLICY CERTIFICATE NO.:**   TNR 18 8157

1.1  Subject to paragraph 1.2 below, this insurance shall not cover loss, damage, liability or expense directly or indirectly caused by or contributed to by or arising from the use or operation, as a means for inflicting harm, of any computer, computer system, computer software program, malicious code, computer virus or process or any other electronic system.

1.2  When this exclusion is endorsed on policies covering risks of war, civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or any hostile act by or against a belligerent power, or terrorism or any person acting from a political motive, paragraph 1.1 shall not operate to exclude losses (which would otherwise be covered) arising from the use of any computer, computer system or computer software program or any other electronic system in the launch and/or guidance system and/or firing mechanism of any weapon or missile.

1.3  When this exclusion is endorsed on policies which also have endorsed "Loss of Business Income and Incident Response Endorsement for Theft of Private Customer and Employee Data", paragraph 1.1 shall not operate to exclude losses (which would otherwise be covered) arising from the use of any computer, computer system or computer software program.  If "Loss of Business Income and Incident Response Endorsement for Theft of Private Customer and Employee Data" is not endorsed, paragraphs 1.1 and 1.2 shall apply.

10/11/03
CL380

Countersigned:   _David J. Hanley_
                 Authorized Representative

## **NUCLEAR INCIDENT EXCLUSION CLAUSE - LIABILITY - DIRECT (BROAD)**

**POLICY CERTIFICATE NO.:**   TNR 18  8157

For attachment to insurances of the following classification in the USA., its Territories and Possessions, Puerto Rico and the Canal Zone:

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including Railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability) not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This policy* does not apply:

I.    Under any Liability Coverage, to injury, sickness, disease, death or destruction:

a.   with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

b.   resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.   Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.  Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

a.   the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

b.   the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

c.   the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.  As used in this endorsement:
"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means sources material, special nuclear material or byproduct material; "source material", "special nuclear material: and "byproduct material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization if any nuclear material and (2) resulting from the operation by any person or organization if any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means:

a.   any nuclear reactor;

b.   any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste;

c.   any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams or uranium 235;

d.   any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.  With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.  It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

*NOTE:  As respects policies which afford liability coverage and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

N.M.A. 1256

Countersigned:   _David J Hanley_
                        Authorized Representative

## NEW SHORT RATE CANCELLATION TABLE ENDORSEMENT (U.S.A.)

**POLICY CERTIFICATE NO.:**   TNR 18  8157

Notwithstanding anything to the contrary contained herein and in consideration of the premium for which this Insurance is written it is agreed that in the event of cancellation thereof by the Insured the Earned Premium shall be computed as follows:

### SHORT RATE CANCELLATION TABLE

A.      For insurances written for one year:

| Days Insurance in Force | Percent of One Year Premium | Days Insurance in Force | Percent of One Year Premium |
|---|---|---|---|
| 1 | 5 | 154-156 | 53 |
| 2 | 6 | 157-160 | 54 |
| 3-4 | 7 | 161-164 | 55 |
| 5-6 | 8 | 165-167 | 56 |
| 7-8 | 9 | 168-171 | 57 |
| 9-10 | 10 | 172-175 | 58 |
| 11-12 | 11 | 176-178 | 59 |
| 13-14 | 12 | 179-182 (6 Months) | 60 |
| 15-16 | 13 | 183-187 | 61 |
| 17-18 | 14 | 188-191 | 62 |
| 19-20 | 15 | 192-196 | 63 |
| 21-22 | 16 | 197-200 | 64 |
| 23-25 | 17 | 201-205 | 65 |
| 26-29 | 18 | 206-209 | 66 |
| 30-32 (1 Month) | 19 | 210-214 (7 Months) | 67 |
| 33-36 | 20 | 215-218 | 68 |
| 37-40 | 21 | 219-223 | 69 |
| 41-43 | 22 | 224-228 | 70 |
| 44-47 | 23 | 229-232 | 71 |
| 48-51 | 24 | 233-237 | 72 |
| 52-54 | 25 | 238-241 | 73 |
| 55-58 | 26 | 242-246 (8 Months) | 74 |
| 59-62 (2 Months) | 27 | 247-250 | 75 |
| 63-65 | 28 | 251-255 | 76 |
| 66-69 | 29 | 256-260 | 77 |
| 70-73 | 30 | 261-264 | 78 |
| 74-76 | 31 | 265-269 | 79 |
| 77-80 | 32 | 270-273 (9 Months) | 80 |
| 81-83 | 33 | 247-278 | 81 |
| 84-87 | 34 | 279-282 | 82 |
| 88-91 (3 Months) | 35 | 283-287 | 83 |
| 92-94 | 36 | 288-291 | 84 |
| 95-98 | 37 | 292-296 | 85 |
| 99-102 | 38 | 297-301 | 86 |
| 103-105 | 39 | 302-305 (10 Months) | 87 |
| 106-109 | 40 | 306-310 | 88 |
| 110-113 | 41 | 311-314 | 89 |
| 114-116 | 42 | 315-319 | 90 |
| 117-120 | 43 | 320-323 | 91 |
| 121-124 (4 Months) | 44 | 324-328 | 92 |
| 125-127 | 45 | 329-332 | 93 |
| 128-131 | 46 | 333-337 (11 Months) | 94 |
| 132-135 | 47 | 338-342 | 95 |
| 136-138 | 48 | 343-346 | 96 |
| 139-142 | 49 | 347-351 | 97 |
| 143-146 | 50 | 352-355 | 98 |

| 147-149 | 51 |
|---|---|
| 150-153 (5 Months) | 52 |

| 356-360 | 99 |
|---|---|
| 361-365 (12 Months) | 100 |

B.  For Insurances written for more or less than one year:

1.  If insurance has been in force for 12 months or less, apply the standard short rate table for annual insurances to the full annual premium determined as for an insurance written for a term of one year.

2.  If insurance has been in force for more than 12 months:

(a)  Determine full annual premium as for an insurance written for a term of one year.

(b)  Deduct such premium for the full insurance premium, and on the remainder calculate the pro rata Earned Premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the insurance was originally written.

(c)  Add premium produced in accordance with items (a) and (b) to obtain Earned Premium during full period insurance has been in force.

*All other terms, conditions and exclusions of this Policy remain unchanged.*

NMA45

Countersigned:   *David J Hanley*
Authorized Representative

## U.S. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED
## NOT PURCHASED CLAUSE

**POLICY CERTIFICATE NO.:**   TNR 18 8157

This Clause is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.

It is hereby noted that the Underwriters have made available coverage for "insured losses" directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA") and the Insured has declined or not confirmed to purchase this coverage.

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance therefore affords no coverage for losses, damage, cost or expense of whatsoever nature, directly or indirectly resulting from or in connection with any "act of terrorism" as defined in TRIA regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

For the purpose of this endorsement an act of terrorism means an act, including but not limited to:-

the use of force or violence and/or the threat thereof, the actual, threatened, feared or perceived use of any biological, chemical, radioactive or nuclear agent, material, device or weapon, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to the above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the **Insured**.

This exclusion shall not apply when the **Insured's Products** or a **Covered Location** are the sole, direct target of the individual or group described.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

LMA5219 (as amended)
12 January 2015

Countersigned:   *David J Hanley*

Authorized Representative

UMR Number: B113518B01324

**SANCTION LIMITATION AND EXCLUSION CLAUSE**

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

15/09/10

**LMA3100**

### TRADE NAME RESTORATION LOSS OF BUSINESS INCOME
### AND INCIDENT RESPONSE INSURANCE
### FOR FOOD BORNE ILLNESS

It is agreed by the **Insured** and Underwriters that the attached Declarations, Application and any material submitted therewith, and Endorsements are made a part of this insurance, constitute the basis of this Policy, and that the **Insured** warrants that the statements contained in the Application Form are true and complete.  PLIS, Inc. is not an Insurer and does not provide this insurance.

1. **INSURING AGREEMENT**

    In consideration of the foregoing and payment of the Premium, Underwriters agree, subject to all the terms, conditions, limitations and exclusions set forth herein, to indemnify the **Insured** for the following, provided that such result directly and solely from an **Incident** that occurs within the **Period of Insurance** and is reported to Underwriters in accordance with Section 7.1 of this Policy, which in no event shall be later than ninety (90) days following the termination of the **Period of Insurance**:

    1.1 **Actual Net Loss** in excess of any **Deductible** sustained by the **Insured** at each **Affected Covered Location** during a **Period of Restoration**;

    1.2 **Incident Response Expenses** in excess of any **Deductible**, except as to **Crisis Management Expenses**, incurred by the **Insured** during the **Period of Restoration** but only when working in cooperation with the designated crisis management consultant listed in Section E of the Declarations; and

    1.3 **Extortion Payments** incurred by the **Insured** during the **Period of Restoration** but only when working in cooperation with the designated crisis management consultant listed in Section E of the Declarations.

2. **LIMITS OF INDEMNITY**

    2.1 "**Limit of Indemnity for Restaurant Events**" - Underwriters' maximum liability for **Actual Net Loss** and **Incident Response Expenses** affecting all **Covered Locations** insured hereunder for **Restaurant Events** shall not exceed the "Limit of Indemnity for **Restaurant Events**" set forth in Section B of the Declarations and shall be in excess of any **Deductible**.  An **Insured** may only recover under this Section 2.1 for an **Incident** that does not include any **Supplier Events**. *See* DEFINITIONS (Section 4) below.

    2.2 "**Limit of Indemnity for Supplier Events**" - Underwriters' maximum liability for **Actual Net Loss** and **Incident Response Expenses** affecting all **Covered Locations** insured hereunder for **Supplier Events** shall not exceed the "Limit of Indemnity for **Supplier Events**" set forth in Section B of the Declarations and shall be in excess of any **Deductible**.  If any indemnity is owed under this Section 2.2 for any **Incident**, no indemnity shall be owed under Section 2.1 above for that same **Incident**, regardless of the number of **Restaurant Events** or **Supplier Events** involved and irrespective of whether an **Insured** sustains any loss, in whole or in part, as a result of any **Restaurant Event**.

    2.3 "**Limit of Indemnity for Incident Response Expenses**" - Underwriters' maximum liability for **Incident Response Expenses** affecting all **Covered Locations** insured hereunder for **Restaurant Events** and **Supplier Events** shall not exceed the corresponding "Limit of Indemnity for **Incident Response Expenses**" set forth in Section B of the Declarations, regardless of the number of **Insureds** named in the Declarations.  **Incident Response Expenses** shall be in excess of any **Deductible**, except that **Crisis Management Expenses** paid as part of **Incident Response Expenses** shall not be subject to the **Deductible**.  Any amounts paid hereunder with respect to **Incident Response Expenses** shall reduce the remaining applicable Limits of Indemnity payable with respect to **Actual Net Loss.**

    2.4 "**Limit of Indemnity for Extortion Payments**" – Underwriters' maximum liability for **Extortion Payments** during the **Period of Insurance** shall not exceed the "Limit of Indemnity for **Extortion Payment**" set forth in Section B of the Declarations.

    2.5 "**Total Policy Aggregate Limit of Indemnity**" - Underwriters' maximum liability for all **Actual Net Loss**, **Incident Response Expenses**, and **Extortion Payments** arising from all **Incidents** affecting all **Covered Locations** occurring during **the Period of Insurance** shall not exceed the "Total Policy Aggregate Limit of Indemnity" set forth in Section B of the Declarations, regardless of the number of **Covered Locations** insured hereunder or the number of **Insureds** named in the Declarations, and shall be in excess of any **Deductible** and not reduced by any **Deductible**.

© Copyright PLIS®, Inc.                                        TNR Policy Form 02-17

**2.6** "**Shared Aggregate Limit of Indemnity**" - Notwithstanding the provisions of Sections 2.1 through 2.5 above, if Underwriters have issued Policies to other **Trade Name Operators**, Underwriters' maximum liability for **Actual Net Loss**, **Incident Response Expenses**, or **Extortion Payments** affecting all business establishments sharing that same trade name (including the **Covered Locations** insured hereunder) shall be limited as set forth in greater detail in any Shared Aggregate Endorsement attached hereto.

## 3.   LOSS ADJUSTMENT

**3.1** Underwriters shall be under no obligation to pay any **Actual Net Loss**, **Incident Response Expenses**, or **Extortion Payments** until the **Insured** has submitted a complete **Loss Submission** and Underwriters have had a reasonable opportunity to investigate the cause(s) of any **Incident**, allowing necessary time to receive and review of any report(s) from any **Public Health Authority**.

**3.2** The premium and any expenses incurred in the formulation of a claim hereunder shall not be recoverable items as **Actual Net Loss**, **Incident Response Expenses**, or **Extortion Payments** under this insurance.

**3.3** In the event the **Insured** receives or enters into an agreement to receive any make up of loss, salvage, settlement, recoveries, payments, credits, or other financial benefits in compensation for any loss covered under this Policy from any person or entity other than Underwriters, the amount of **Actual Net Loss**, **Incident Response Expenses**, or **Extortion Payment** will be reduced by the amount of any such make up of loss, salvage, settlement, recoveries, payments, credits, or other financial benefits, regardless of whether any such amounts have been paid to or received by the **Insured** at the time of payment by Underwriters. Nothing in this Section 3.3 shall serve to void Underwriters' rights or the **Insured's** obligations under the subrogation provision in Section 8.7.

**3.4** **Actual Net Loss** for each **Affected Covered Location** shall be calculated in accordance with the following formula:

$$[(A - B) \times C] + D$$

| where | **A** | = | The **Insured's Normal Gross Revenue** |
|---|---|---|---|
| | **B** | = | The **Insured's Affected Gross Revenue** |
| | **C** | = | The **Insured's Normal Operating Margin** |
| | **D** | = | The **Insured's Recoverable Necessary Costs of Sales** |

**3.5** Underwriters will reduce the amount of the **Insured's Actual Net Loss** to the extent the **Insured's** normal and customary business operations can be resumed, in whole or in part, at the **Affected Covered Locations** or elsewhere, and the **Insured** either fails to resume or delays the resumption of such operations. If this happens, Underwriters will indemnify the **Insured** hereunder based on the length of time it would have taken to resume such operations had the **Insured** exercised reasonable due diligence.

**3.6** **Incident Response Expenses** shall be calculated separately from **Actual Net Loss** as defined in Section 4.13.

**3.7** Following an **Incident** involving a **Restaurant Event** or **Supplier Event,** Underwriters may, at their sole discretion, agree to make interim payments of **Actual Net Loss** and **Incident Response Expenses** in excess of the **Deductible**. Such interim payments shall be without prejudice to any coverage position taken by Underwriters.

## 4.   DEFINITIONS

Wherever used herein, the following terms shall have the meanings set forth below

**4.1** "**Accidental Contamination**" means an error in the production or preparation of the **Insured's Products**, or of ingredients used in the production or preparation of the **Insured's Products** which if consumed or used as intended, could lead to or has led to bodily injury, sickness, disease or death of any person(s) which has or would physically manifest itself by way of clear, obvious or visible symptoms within 365 days of use or consumption.

**4.2** "**Actual Net Loss**" means the loss for each **Affected Covered Location** calculated in accordance with Section 3.4.

**4.3** "**Affected Covered Location**" means a **Covered Location** whose **Normal Gross Revenues** are reduced due directly and solely to the occurrence of an **Incident**.

**4.4** "**Affected Gross Revenues**" means the **Gross Revenues** actually earned by the Insured at an **Affected Covered Location** during the **Period of Restoration**.

**4.5** "**Covered Location**" or "**Covered Locations**" means the place or places of business of the **Insured** described on the **Covered Location** Endorsement hereto as well as new places of business, operating under the same Trade Name(s) as listed in Section A of the Declarations, opened or acquired by the **Insured** during the **Period of Insurance.**

**4.6** "**Crisis Management Expenses**" means the reasonable and necessary fees and expenses of the crisis management consultant listed in Section E of the Declarations following an **Incident**.  The fact that the dedicated crisis management consultant provides assistance does not constitute acceptance by Underwriters that a claim or any loss is covered under this Policy.

**4.7** "**Deductible**" means the amount that the **Insured** shall bear uninsured for each and every **Incident** as set forth in Section B of the Declarations or any applicable Endorsements.

**4.8** "**Extortion Expenses**" means expenses paid by the **Insured** as a direct result of an **Extortion Threat**, including:

  (a) the amount paid by the Insured as a reward to an **Informant** for information that mitigates an **Extortion Threat** or results in a recovery of all or any portion of **Extortion Payments**, other than **Extortion Expenses**,

  (b) interest paid or to be paid on any loan from a financial institution to the Insured for the purpose of paying an **Extortion Payment**;

  (c) cost of travel and accommodation incurred by or on behalf of the **Insured** while attempting to negotiate an **Extortion Threat**;

  (d) medical services and hospitalization cost incurred by any person directly involved in the handling or negotiating of an **Extortion Payment** and paid by the **Insured** as a direct result of an **Extortion Threat** within 36 months following the last credible **Extortion Threat** discovered during the **Period of Insurance** including, but not limited to, any costs for treatment by a neurologist or psychiatrist, costs for cosmetic surgery and the additional expenses related to treatment, as approved by underwriters;

  (e) fees and expenses of an independent forensic analyst engaged by the Insured to determine whether **Malicious Contamination** has occurred;

  (f) fees and expenses of a qualified interpreter to assist the Insured relating to an **Extortion Threat**;

  (g) increased cost of security, including hiring of security guards, armored vehicles, and overtime pay for existing security staff for a period of up to 120 days, provided that the designated **Crisis Management** company as stated in the **Declarations** has specifically recommended such additional security measures; and

  (h) any additional expenses recommended by the designated **Crisis Management** company as stated in the D**eclarations** and approved by **Underwriters**.

**4.9** "**Extortion Payment**" means **Extortion Expenses** and monies or the monetary value of other consideration (net of any recoveries subsequently made) paid or delivered by the insured, under duress, to a third party, following receipt of an **Extortion Threat.**

**4.10** "**Extortion Threat**" means a threat made by a third party against the **Insured** to commit a **Malicious Contamination** unless the third party's demand for money or other consideration is met.

**4.11** "**Food Borne Illness**" means the occurrence of two or more people experiencing similar physical symptoms of bodily injury, sickness, disease or death, resulting from the ingestion of the **Insured's Products**.

**4.12** "**Gross Revenues**" means the gross revenues derived from business operations carried on by the **Insured** at a **Covered Location**, as more fully itemized in the Application and as determined by U.S. Generally Accepted Accounting Principles.

**4.13** "**Incident**" means a **Restaurant Event**, **Supplier Event**, or **Extortion Threat**.  All **Restaurant Events, Supplier Events**, or **Extortion Threats** arising out of the same common cause shall be considered one **Incident**, regardless of the number of involved persons, **Public Announcements**, or **Covered Locations**, and the **Incident** shall be deemed to have occurred at the time of the earliest occurrence of the **Restaurant Event**, **Supplier Event**, **Public Announcement** thereof, or **Extortion Threat**.  In the event either a **Restaurant Event** or **Extortion Threat** or both is considered one **Incident** with a **Supplier Event** under this provision, the combined **Incident** shall be considered solely as a **Supplier Event**.

**4.14** "**Incident Response Expenses**" means the following reasonable and necessary expenses incurred by the **Insured** after the occurrence of an **Incident**, that are additional to those usual and customary expenses that would have been incurred in the absence of the **Incident**, exclusively for the purpose of preventing, mitigating or minimizing a loss covered by this insurance:

  (a) the cost of public relations specialists, radio or television announcements and newspaper advertising, as approved in writing in advance by Underwriters;

(b)   the cost of hiring temporary replacement staff at a **Covered Location** other than regular employees of the **Insured**.  This cost does not include fees or expenses incurred for services of professionals such as attorneys, doctors, accountants, and similar professionals;

(c)   compensation paid to regular employees of the **Insured** for overtime;

(d)   **Crisis Management Expenses**;

(e)   **Product Recall Expenses**; and

(f)   similar, directly-related mitigation expenses as approved in writing in advance by Underwriters.

4.15 "**Informant**" means any person, other than the **Insured** or other member of the **Insured's Management,** providing material information not otherwise obtainable in return for a reward offered by the **Insured** in connection with an **Extortion Threat**.

4.16 "**Insured**" or "**Insureds**" means the entity or entities designated as the **Insured(s)** in Section A of the Declarations.

4.17 "**Insured's Management**" means the **Insured's** past or present Chairman, Chief Executive Officer, Managing Director, any executive or non-executive Director of the **Insured** and any person who holds or has held an equivalent position or who has or had authority to make decisions about the operation or management of the **Insured's** business on behalf of the **Insured,** including any legal compliance, risk management, internal audit, risk management, or insurance department or division.

4.18 "**Insured's Products**" means those food and drink products furnished at any **Covered Location** or **Trade Name Location** in the regular course of business at such location.

4.19 "**Loss Submission**" means a statement of **Actual Net Loss** and **Incident Response Expenses** prepared by the **Insured**, with all relevant supporting, verifying and backup documentation required to substantiate any claimed **Actual Net Loss**, **Incident Response Expenses**, or **Extortion Payment** as further set out in Section 7.3.

4.20 "**Malicious Contamination**" means an intentional, malicious and illegal alteration or adulteration of the **Insured's Products**, or of ingredients used in the production or preparation of the **Insured's Products**, that is likely to give the **Insured** and/or the public reasonable cause to believe that such products have been rendered unfit or dangerous for the use for which they were intended by the **Insured**.

4.21 "**Normal Gross Revenues**" means **Gross Revenues** the **Insured** can satisfactorily prove would have been generated from its normal and customary business operations at an **Affected Covered Location** in the absence of an **Incident**.  **Normal Gross Revenues** shall be determined by Underwriters based on an analysis of the **Gross Revenues** derived from the **Insured's** normal and customary business operations at the **Covered Location** during the corresponding period in the year prior to the **Incident** (the prior year **Gross Revenues** being adjusted, however, to allow for all material trends, variations or changes in market conditions of any nature whatsoever which would have affected **Gross Revenues** of the **Insured** even in the absence of an **Incident**).

4.22 "**Normal Operating Margin**" means the percentage of **Insured's Normal Gross Revenues** remaining after subtracting variable costs of sales from the corresponding period in the year prior to the **Incident**, which include without limitation, costs of food, beverages, paper, labor (including payroll taxes), credit card fees, and other costs which fluctuate with sales, but before taxes and other indirect fixed or semi-fixed costs from the corresponding period in the year prior to the **Incident**, which include without limitation rent, utilities, management or executive compensation, bonuses and interest.

4.23 "**Period of Insurance**" means the period of insurance coverage set forth in Section A of the Declarations.

4.24 "**Period of Restoration**" means the period that commences on the date of the **Incident** and ends on the earlier of the following dates:

(a)   the first date that the **Gross Revenues** derived from the **Insured's** normal and customary business operations at each **Affected Covered Location** return to the **Normal Gross Revenues** for such **Affected Covered Location** and thereafter remain at or above the **Normal Gross Revenues** for such **Affected Covered Location** for the next six (6) consecutive days; or

(b)   the last date of the period of time set forth in Section C of the Declarations from the date of the **Incident**.

The **Period of Restoration** shall not be affected by the expiration of the **Period of Insurance**.

4.25 "**Product Recall Expenses**" means costs incurred by the **Insured** in removing actual or suspected contaminated food products from a **Covered Location**.

**4.26** "**Public Announcement**" an announcement, publication or broadcast in any media (including but not limited to radio, television, internet, social media, newspapers and magazines) or a **Public Health Authority.** .

**4.27** "**Public Health Authority**" means any governmental authority having jurisdiction over the **Insured's** operations relating to health and hygiene standards for the protection of the public.

**4.28** "**Recoverable Necessary Costs of Sales**" means those reasonable and necessary variable costs, incurred by the **Insured** to generate **Affected Gross Revenues**, that (a) are in excess of the Insured's normal variable costs of production, derived from the calculation of the **Insured's Normal Operating Margin**, and (b) could not have been reasonably reduced or eliminated because, as agreed between Underwriters and the **Insured**, the expenses were necessary to maintain the **Insured's** normal and customarily means of operating each **Affected Covered Location** and reducing or eliminating the costs would cause the **Insured** undue hardship.  **Recoverable Necessary Costs of Sales** shall never include any **Incident Response Expenses**.

**4.29** "**Restaurant Event**" means either
  (a)  an occurrence of or
  (b)  **Public Announcement** of an actual, suspected or alleged:

**Food Borne Illness**, **Accidental Contamination**, or **Malicious Contamination**, provided the **Food Borne Illness**, **Accidental Contamination**, or **Malicious Contamination** resulted from operations at a **Covered Location** or at a **Trade Name Location** and did not result from, directly or indirectly, in whole or in part, a **Supplier Event**.

**4.30** "**Supplier**" means any person or entity who delivers, distributes, ships, transports, furnishes, provides, processes, possesses, stores, prepares, packages, creates, manufactures, grows, harvests, sorts, washes, or labels any items or services that are used, have been used, or may be used at any **Covered Location** or any **Trade Name Location** or that are used, have been used, or may be used in the delivery, distribution, shipping, transporting, furnishing, providing, processing, possessing, storing, preparation, packaging, creating, manufacturing, growing, harvesting, sorting, washing, or labeling of any items or services that are used, have been used, or may be used at any **Covered Location** or any **Trade Name Location**.  Any such items and services include, but are not limited to, the **Insured's Products**, any products provided or served at any **Trade Name Location**, any ingredients or commodities used in the creation, production, processing, growing, or preparation of the **Insured's Products**, products provided or served at any **Trade Name Location** or any component parts thereof.

**Supplier** specifically includes all persons or entities in the chain of supply, downstream or upstream, used by any **Trade Name Location**.

Unless modified by an endorsement attached hereto, **an Insured** or **Trade Name Operator** operating as a commissary, distribution center, or warehouse/storage facility for multiple restaurant locations is considered a **Supplier**.  **Supplier** does not include any other **Insured** or **Trade Name Operator**.

**4.31** "**Supplier Event**" means either
  (a)  an occurrence of or
  (b)  **Public Announcement** of an actual, suspected or alleged:

**Food Borne Illness**, **Accidental Contamination**, or **Malicious Contamination** provided the **Food Borne Illness**, **Accidental Contamination**, or **Malicious Contamination** directly or indirectly was caused by, arose out of, was contributed to by, was in consequence of, or resulted from, in whole or in part, any act, error, or omission of any **Supplier**.

Any occurrence or **Public Announcement** of an actual, suspected, or alleged **Food Borne Illness**, **Accidental Contamination**, or **Malicious Contamination** is a **Supplier Event** if one of the following conditions is met:
  (a)  any **Public Health Authority** determines the **Food Borne Illness**, **Accidental Contamination**, or **Malicious Contamination** was more likely than not caused by, contributed to by, in consequence of, resulting from, or arose out of, in whole or in part, any item or service of any **Supplier**; or
  (b)  any **Public Announcement** references or suggests, directly or indirectly, that a suspected or alleged **Food Borne Illness**, **Accidental Contamination**, or **Malicious Contamination** was caused by, contributed to by, in consequence of, resulting from, or arose out of, in whole or in part, any item or service of a **Supplier** and there was no actual **Food Borne Illness**, **Accidental Contamination**, or **Malicious Contamination**.

**4.32** "**Trade Name Location**" means any place of business, other than a **Covered Location**, of any establishment having the same trade name(s) as any trade name(s) set forth in Section A of the Declarations.

**4.33** "**Trade Name Operator**" means any person or entity, other than an **Insured**, who operates a business establishment having the same trade name(s) as any trade name(s) set forth in Section A of the Declarations.

5. **CONDITIONS PRECEDENT TO LIABILITY**

It is a condition precedent to Underwriters' liability under this Insurance that the **Insured** has:

**5.1** truthfully declared all material facts likely to influence a reasonable Underwriter in determining (a) whether or not to accept the risk, (b) the premium, and (c) the conditions, exclusions and limitations of this insurance; and the **Insured** has diligently made all necessary inquiries to establish these facts;

**5.2** no knowledge at inception of the **Period of Insurance** of any undisclosed matter, fact or circumstance, actual or threatened, that increases or could increase the possibility of a loss under this insurance;

**5.3** paid the premium due in accordance with the conditions of the quotation included in the Application and/or in the ensuing quotation;

**5.4** declared that all information contained in the written Application or in documents supplied in support of such Application in all respects is full, true and complete.  Further, the **Insured** agrees that all such information is material and forms the basis of this insurance;

**5.5** advised Underwriters of any changes in the information described in this Section 5, which took place prior to the inception of the **Period of Insurance**;

**5.6** in the event of an **Incident**, sought the immediate assistance of and has cooperated with the appointed crisis management consultant as defined in Section E of the Declarations; and

**5.7** in the event of an **Incident**, complied with all applicable conditions and obligations set forth in Sections 3 and 7 of this Policy.

6. **EXCLUSIONS**

This insurance does not cover any **Actual Net Loss**, **Incident Response Expenses**, or **Extortion Payments** directly or indirectly caused by, arising out of, contributed to by, in consequence of, or resulting from, any of the following:

**6.1** any cause or reason other than as a direct and sole result of an **Incident**;

**6.2** actual or threatened war, invasion, acts of foreign enemies, hostilities, insurrection, (whether war be declared or not), civil war, rebellion, revolution, military or usurped power, confiscation, nationalization, requisition or destruction of or damage to property by or under the order of any government or public or local authority;

**6.3** civil commotion assuming the proportions of or amounting to a popular uprising or riot, martial law or the act of any lawfully constituted authority in the furtherance of maintaining public order;

**6.4** seizure or destruction under quarantine or customs regulations, confiscation, nationalization or requisition or destruction of or damage to property, by or under the order of any government or public or local authority, or the handling of contraband or the engaging in illicit trade or transportation;

**6.5** nuclear radiation or contamination, including but not limited to the following:
   **(a)** ionizing radiation or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel;
   **(b)** the radioactive, toxic, explosive or other hazardous properties of any nuclear assembly or nuclear component thereof; unless caused directly and solely by an **Incident**;

**6.6** seepage and/or pollution and/or contamination unless it is discovered during the **Period of Insurance** and is the direct and sole cause of an **Incident**;

**6.7** any of the following:
   **(a)** withdrawal, insufficiency or lack of financing, howsoever caused,

(b) the financial failure or lack of adequate receipts, sales or profits of any venture, other than a **Covered Location** when caused directly and solely by an **Incident**,

(c) variations in the rate of exchange, rate of interest or stability of any currency, or

(d) financial default, insolvency or failure to pay of any person, firm or corporation, whether a party to this insurance or otherwise;

6.8 a delay in resuming business operations at an **Affected Covered Location** due to interference by strikers or other persons (other than media personnel covering an **Incident**);

6.9 a suspension, lapse or cancellation of any license, lease or contract unless caused directly and solely by an **Incident**;

6.10 any failure to discontinue operations at a **Covered Location** when a product, practice, circumstance, or event creates a situation that requires immediate correction or cessation of operation to prevent injury, as required by any federal, state, or local food code regulation or sanitation standard;

6.11 **Accidental Contamination** caused by violation of any federal, state, or local food code regulation or sanitation standard by any **Insured** or **Trade Name Operator**, if such **Accidental Contamination** was willfully committed with a reckless disregard for the health, safety, or welfare of the public;

6.12 any announcement, publication, or broadcast by the **Insured**, media, or **Public Health Authority** concerning any health department inspection results or failure to comply with any federal, state or local food code regulation or sanitation standards by a **Covered Location**, unless such announcement, publication, or broadcast occurs solely in direct connection to an **Incident.**

6.13 any of the following:

(a) Bovine Spongiform Encephalopathy (also known as "BSE") and/or Creutzfeldt-Jakob disease (CJD),

(b) Hoof and Mouth disease,

(c) Genetically Modified Organisms, or

(d) any Influenza, including but not limited to Influenza virus A, B, or C, Avian Flu, H1N1, or any mutant variations thereof;

6.14 any act, error, or omission of any person or entity, including but not limited to any **Supplier**, whom any **Insured** has released or agreed to release from liability or for whom any **Insured** has waived or limited or agreed to waive or limit the right of contribution, indemnity, subrogation or any other recovery rights or claims, unless Underwriters consent in writing to the waiver, release, or limitation.  This exclusion applies regardless of whether such release, waiver, or limitation occurred before or after the **Incident**;

6.15 the delivery of; interruption of; actual, alleged or potential contamination of; or public health authority warning not to consume:  water from public utilities, private water services, or wells that supply water to a **Covered Location**.  This exclusion shall **not** apply to bottled water served by the **Insured** in the regular course of business;

6.16 any level of infestation, as described by any local, state, or federal health or sanitary regulation or code applicable to the infested premises, of rodent, varmint, vermin, or any other noxious or objectionable animals, including but not limited to ants, bees, bedbugs, beetles, cockroaches, fleas, flies, gnats, hornets, lice, mice, mosquitoes, moths, rats, spiders, or termites.

This insurance also does not cover any of the following:

6.17 any actual or alleged liability of the **Insured** to third parties arising from bodily injury, sickness, disease or death of any person or animal, or from damage to or destruction of any property, including loss of use thereof, or any other liability of the **Insured**, whether in tort or contract, to third parties, howsoever arising;

6.18 fines or penalties of any kind; and

6.19 any **Actual Net Loss**, **Incident Response Expenses**, or **Extortion Payment** which is insured by or would, but for the existence of this insurance, be insured by any other insurance(s) except for any excess beyond the amount which would have been payable under such other insurance(s) had this insurance not been effected.

6.20  any actual or alleged damages arising from the destruction or impairment of any real or tangible property, including loss of use thereof.

7.  **DUTIES IN THE EVENT OF AN INCIDENT**

7.1   It is a condition precedent to the liability of Underwriters under this insurance that in the event of any **Incident** occurring during the **Period of Insurance**, **Insured**, or an individual authorized by the **Insured**, shall do all of the following:

   (a)   provide Underwriters with immediate notice and a full description of the **Incident**, and diligently endeavor to seek the immediate assistance and cooperate with the appointed crisis management consultant in accordance with Section 5, Conditions 5.6;

   (b)   notify the police or other applicable law enforcement agency if a law may have been broken;

   (c)   resume the **Insured's** normal and customary business operations at the **Affected Covered Locations** as soon as reasonably practicable at the same level of service that existed prior to the **Incident**;

   (d)   take all reasonable steps to reduce the impact of the **Incident** by, without limitation, using the appointed crisis management consultant, and their recommended public relations specialists, advertising and the media to access the public to reestablish the reputation, trade name, and market share of the **Insured's** business operations at each **Affected Covered Location**, cooperating in every reasonable respect with Underwriters and permitting Underwriters or their authorized representatives to, at Underwriters' expense, take whatever actions Underwriters consider necessary to:

   (i)   assess, prevent, mitigate or minimize a loss, and

   (ii)   pursue all rights or remedies available to the **Insured** whether or not payment has been made hereunder;

   (e)   cooperate fully with Underwriters in the investigation of the claim, including but not limited to:

   (i)   maintaining a comprehensive record of the expenses incurred and actions taken to prevent, mitigate or minimize the amount of loss covered under this insurance and furnishing them to Underwriters upon request;

   (ii)   producing any documentary evidence, books of account, bills, invoices and other vouchers and copies of same that Underwriters or their authorized representatives may require; and

   (iii)   affording Underwriters reasonable access to the **Insured's** premises at all **Affected Covered Locations**.

7.2   The **Insured** shall make no **Extortion Payment** without the prior consent of Underwriters and in connection therewith shall at all times act in accordance with all applicable laws, regulations and law enforcement instructions.

7.3   In the event of any **Actual Net Loss** under Section 1.1, any **Incident Response Expenses** under Section 1.2, or **Extortion Payments** under Section 1.3, the **Insured** shall, as soon as practicable, but in no event later than six months after the maximum time allotted for the **Period of Restoration**, provide Underwriters with a **Loss Submission**, which sets out for each **Affected Covered Location**:

   (a)   historical and actual gross sales, in a format and covering a time period that is requested by Underwriters;

   (b)   historical, detailed profit and loss statements, covering a period of up to three (3) years prior to the **Incident**;

   (c)   a list of **Incident Response Expenses** with full supporting documentation.

The **Insured** shall maintain and produce any documentary evidence, books of account, bills, invoices and other vouchers and copies of the same related to the **Incident** which Underwriters may require, and the **Insured** shall afford Underwriters and their Appointed Representative every assistance in their investigations including reasonable access to the **Insured's** premises, personnel and necessary documents for the purpose of the computation of any **Actual Net Loss, Incident Response Expenses**, or **Extortion Payments**.

8.  **CONDITIONS**

8.1   Any fraud, misstatement or concealment in the information required of the **Insured** pursuant to Section 5 or in the making of a claim under this insurance or otherwise howsoever shall render all claims hereunder forfeit.

8.2   If the **Insured** shall become aware during the **Period of Insurance** of any specific fact or circumstance which may reasonably be expected to result in an **Incident**, the **Insured** shall give immediate written notice to the Underwriters' representative identified in Section E of the Declarations for Claims Notification of : (i) the specific fact or circumstance, (ii) the loss or damage which has or may result from such fact or circumstance, and (iii) the means by which the **Insured** first became aware of such fact or circumstance.

If the **Insured** immediately provides the written notice required by this Section 8.2, any **Incident** that may subsequently arise from such fact or circumstance shall be deemed to have occurred on the date when such written notice was received by Underwriters' representative as provided herein.

8.3   The **Insured** shall at all times do and concur in doing all things necessary to prevent, mitigate or minimize an **Actual Net Loss** under this insurance.

© Copyright PLIS®, Inc.     TNR Policy Form 02-17

8.4    This insurance, the Declarations and the Application, and all Endorsements thereto, shall be read together as one contract, and any word or expression to which a specific meaning has been attached in any part of these documents shall bear such meaning wherever it may appear.

8.5    No other insurance shall be effected by the **Insured** to protect the interests insured hereunder without the prior written approval of the Underwriters hereon.  In the event that such other insurance is effected, Underwriters reserve the right to amend the terms and conditions of this insurance.

8.6    This insurance may be canceled by the **Insured** at any time by written notice or by surrendering this Policy.  This insurance may also be canceled by or on behalf of the Underwriters by delivering to the **Insured**, by registered, certified or other first class mail, at the **Insured's** address as shown in Section A of the Declarations, written notice stating when, not less than ninety (90) days thereafter (ten (10) days for nonpayment of premium), the cancellation shall be effective.  The mailing of notice as aforesaid shall be sufficient proof of notice and this insurance shall terminate at the time specified in such notice.

If this insurance shall be canceled by the **Insured**, Underwriters shall retain the customary short rate proportion of the premium hereon, except that if this insurance is on an adjustable basis, the Underwriters shall receive the customary short rate proportion of earned premium.

If this insurance shall be canceled by or on behalf of Underwriters, Underwriters shall retain a pro rata proportion of the premium hereon.

Payment or tender of any unearned premium by the Underwriters shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

In the event that a claim is made hereunder, then, if the **Insured** or Underwriters shall at any time afterwards cancel this insurance, premium shall be considered as having been earned in the same ratio as the claim made bears to the "Total Policy Aggregate Limit of Indemnity" set forth in Section B of the Declarations, provided that this does not result in a larger return premium than would otherwise have been developed.

If the period set forth above relating to the giving of notice of cancellation by Underwriters is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of notice permitted by such law.

8.7    Underwriters shall be subrogated to the full extent of any actual or claimed payment under this insurance to all of the **Insured's** rights of recovery against any person or entity, and those rights shall be transferred to Underwriters immediately upon presentment of a claim for payment by the **Insured** to Underwriters.  The **Insured** shall execute all papers required, shall do everything that may be necessary to secure such rights, and shall do nothing, before or after the loss, to impair such rights.  Underwriters reserve the right to pursue an action for recovery from any person or entity, whether before or after payment of a loss, at their sole discretion and in the name of the **Insured** or otherwise.  The **Insured** shall fully cooperate with Underwriters in prosecuting such an action, including without limitation, providing relevant documents, information, and testimony.

8.8    This insurance may not be assigned in whole or in part without the prior written consent of Underwriters.

8.9    If under this insurance the loss payee is other than the **Insured**, all claim payments due under the terms and conditions of this insurance shall be made payable to the party(ies) listed in the Schedule of Loss Payee(s) attached hereto.  Payment of such losses by Underwriters to such loss payee(s) shall be a sufficient and complete discharge of all of Underwriters' obligations to the **Insured** and loss payee(s) in connection with said **Incident**.

8.10    Underwriters or their appointed representatives have the right, but are not obligated, to:
**(a)**    Make crisis management inspections, surveys, and plans at any time in connection with this insurance;
**(b)**    Provide reports to the **Insured** on the conditions found; and
**(c)**    Recommend changes to the **Insured's** operations.

Although crisis management inspections, surveys, plans, or recommendations made by Underwriters or their appointed representatives may serve to reduce a potential loss hereunder, such inspections, surveys, plans and recommendations relate only to insurability and the premiums to be charged.  No safety or liability surveys or plans will be made, and there is no undertaking by Underwriters or their appointed representatives to ensure the health or safety of workers or the public, and there is no warranty that any of the **Insured's** premises or operations:
(i.)    Are safe or free from harmful conditions, or

© Copyright PLIS®, Inc.                                              TNR Policy Form 02-17

(ii.)   Comply with any laws, regulations, codes, or standards.

This condition applies not only to Underwriters, but also to any other person or entity that makes crisis management inspections, surveys, plans, or recommendations for or on behalf of Underwriters.

8.11 Underwriters agree to pay the reasonable costs of **Crisis Management Expenses** during the coverage investigation of an **Incident**. In the event that coverage for the **Incident** is denied by Underwriters, Underwriters may elect to pay reasonable cost of **Crisis Management Expenses** incurred after the denial but such expenses shall not exceed $300,000 USD or the applicable **Incident Response Expenses** limit outlined in Section B of the Declarations, whichever is less, and shall include the **Crisis Management Expenses** already incurred as of the date of the denial of coverage.

## 9.   CHOICE OF LAW, PRECEDENTS TO BRINGING SUIT, JURISDICTION AND APPRAISAL:

9.1  The rights and obligations of the **Insured** and Underwriters, under the Policy, including, but not limited to, the validity of this Policy, interpretation of its terms and conditions and disputes in any way arising under or relating to the Policy shall be construed and interpreted in accordance with the laws of the state of Texas without regard to any choice of law statutes or common law of the State of Texas, any other state, or the United States and without regard to the place of residence or business of the **Insured** or Underwriters or of the place where the loss arose.

9.2  No **Insured** shall take any action, including the filing of a lawsuit against Underwriters or Underwriters' Appointed Representative, until the **Insured** is in full compliance with all of the terms and conditions contained in this policy.

9.3  Any suit by any **Insured** brought under this insurance must be commenced within twenty-four (24) months after a claim or cause of action under this Policy has accrued.

9.4  If Underwriters and the **Insured** fail to agree on the amount of **Actual Net Loss**, **Incident Response Expenses**, or **Extortion Payments** payable under this insurance, either party may make a written demand to the other for an independent appraisal of the **Actual Net Loss**, **Incident Response Expenses**, or **Extortion Payments**. If such a written demand is made, Underwriters and the **Insured** will each select a competent and impartial appraiser who shall be a Certified Public Accountant with a professional background in the food and restaurant business.

The two appraisers will then select an umpire. In the event the two appraisers are unable to agree on an umpire, either may request that the selection of the umpire be made by a judge of a court of competent jurisdiction.

The appraisers will each make an independent determination of the **Actual Net Loss**, **Incident Response Expenses**, or **Extortion Payments**. If they fail to agree on the **Actual Net Loss**, **Incident Response Expenses**, or **Extortion Payments**, the umpire will decide the **Actual Net Loss**, **Incident Response Expenses**, or **Extortion Payments**, which decision will be binding upon the **Insured** and Underwriters. Each party will bear the expenses of its own appraiser and shall share equally in the expenses of the appraisal and for the umpire.

This Section 9.4 applies solely to the determination of the amount of **Actual Net Loss**, **Incident Response Expenses**, or **Extortion Payments** payable under this insurance and does not constitute a waiver of Underwriters' right to deny coverage under this insurance. Any decision by Underwriters to deny a claim hereunder may not be challenged by the **Insured** under the procedures set forth in this Section 9.4.

© Copyright PLIS®, Inc.

TNR Policy Form 02-17